**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **MICHAEL D. WILKINS,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:01CV795** |
| | ) | |
| **J. LAWRENCE CLARY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court by consent of the parties (28 U.S.C. § 636(c)) on a motion

for summary judgment filed by Defendant, George Austin ("Austin"). Having considered the

pleadings and argument, Austin's motion for summary judgment is GRANTED.

### Standard of Review

Summary judgment is only to be granted when there is no genuine dispute as to any issue

of material fact when all justifiable inferences are drawn in favor of the non-moving party and

the movant is entitled to judgment as a matter of law. <u>Celotex Corp. v. Catrett</u>, 477 U. S. 317,

322 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U. S. 242, 255 (1986).  However, unsupported

conclusory allegations by the non-moving party are not sufficient to create a genuine dispute of

material fact sufficient to withstand the granting of dispositive relief. <u>Celotex Corp.</u>, 477 U. S. at

327 (White, J., concurring).  In essence, the court must decide if the evidence when viewed in the

light most favorable to the non-moving party "presents a sufficient disagreement to require

submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter

of law." Anderson v. Liberty Lobby, Inc., 477 U. S. at 251-252. [1]

## Procedural Background

Plaintiff, Michael D. Wilkins (Wilkins), was first arrested on October 22, 1999, as the result of a state multi-jurisdictional grand jury investigation that resulted in various charges against multiple defendants for the solicitation, aiding of prostitution, and related charges. Federal authorities thereafter assumed responsibility for the prosecution of the defendants and the state charges were thereupon dismissed (*nolle prossed*). A federal grand jury first returned an indictment in March 2000 charging Plaintiff with conspiring to distribute and the distribution of crack cocaine. United States v. Marshall Lewis King, *et al*. (E.D. Va. Crim. No. 3:00CR00109). He was arrested pursuant to process issued upon the return of the indictment and detained for some six days before being released on pre-trial supervision. Id. (Docket entry nos. 19, 23). Successive, superceding indictments were returned that further described overt acts of the alleged conspiracy that included the exchange by Wilkins and the co-conspirators of cocaine for sex, the distribution of cocaine to an unidentified individual at Wilkins' business establishment, the purchase of cocaine by Wilkins from an identified source on multiple occasions, and the use of Wilkins' business establishment "for the trading of sex for crack cocaine with Jane Doe #3." (Second Superseding Indictment, Sept. 6, 2000, Overt Acts nos. 15 (U) - (X)). The conspiracy

---

[1]A motion for summary judgment must also include a listing of all material facts in regard to which the moving party contends there is no genuine issue. *See* E.D.Va. R. 56(B). Failure to comply with the Local Rules may result in the dismissal of the motion. However, dismissal is not mandatory if the "[c]ourt can resolve the substantive issues raised and alleviate the need to consider them at trial." Williams v. Gradall Co., 990 F. Supp. 442, 443 (E.D. Va. 1998). Austin has not provided such a listing, but the court is satisfied that it can nevertheless discern the relevant undisputed facts from the pleadings and materials that have been submitted, including the existing court record.

charge against Wilkins was dismissed by the court upon motion for judgment of acquittal at the conclusion of the government's case-in-chief at trial and he was acquitted on the remaining charge by the jury.  (Docket entry nos. 214, 221).

Plaintiff filed this action on November 27, 2001, pursuant to 42 U.S.C. § 1983, alleging that the Defendant George Austin (Austin), a Virginia law enforcement officer, along with several other local law enforcement and prosecution officials, Defendants J. Lawrence Clary, Danny Fox, Pete Kuehl, and Commonwealth's Attorney Nancy M. Thorne ("Mecklenburg Defendants"), violated his constitutional rights guaranteed by the Fourth and Fourteenth Amendments in pursuing a malicious prosecution based on less than probable cause as confirmed by the subsequent dismissal of all charges at trial.  (Compl. ¶1).  Specifically, Plaintiff alleges that the Defendants, including Austin, caused false and fraudulent evidence to be presented to a federal grand jury that resulted in his arrest and prosecution on less than probable cause.  (Compl. ¶¶ 11-13).

By Order and Memorandum Opinion dated June 10, 2002, the district court granted Austin's motion to dismiss the § 1983 claim in his official capacity, denied Austin's motion to dismiss the § 1983 in his personal capacity, and took Austin's motion for summary judgment under advisement to allow him an opportunity to conduct discovery.[2]  On July 19, 2002, all proceedings were stayed pending the outcome of related proceedings on appeal in the criminal prosecution involving the Plaintiff's co-defendants.  The stay was thereafter vacated by Order

---

[2]The court's deferral of the issue pending discovery finds full support in relevant precedent.  *See*, *e.g.*, DiMeglio v. Haines,45 F.3d 790, 795 (4th Cir. 1995).  Although this court has since limited the scope of such discovery, the opportunity for relevant discovery related to the pertinent issues has been afforded.

dated April 26, 2004, following the resolution of the related matters on appeal.  A lengthy

discovery process then ensued as supervised by this court, which included *in camera* review of

the relevant grand jury evidence as well as depositions of relevant witnesses who were implicated

in the subject charges against the Plaintiff.  Following its review of the grand jury materials and

consideration of submissions by counsel concerning what the court perceived to be a core issue,

the court authorized the limited release of the grand jury transcripts to counsel for review and

supplemental briefing.  (Order, Feb. 9, 2005).  Austin now renews his motion for dispositive

relief.

### Undisputed Facts and Reasonable Inferences

The court deems the following to constitute the undisputed facts and reasonable

inferences on which the subject motion is to be resolved:[3]

1.   While conducting an investigation into the activities of State Trooper Marshall
     King ("King"), Austin received information that numerous other individuals,
     including Chief Bruno Crutchfield ("Crutchfield"), Nelson Andrew Brown
     ("Brown"), Percy David Williams, Jr. ("Williams"), and Wilkins, were engaged in
     illegal activity.  These activities included possession and distribution of drugs, the
     exchange of sex for money, and the exchange of sex for drugs.  (Affidavit of
     George W. Austin, Jr., (Austin's Aff.) attached as ex. A to Def.'s Mem. Supp.
     Mot. Dismiss or Summ. J.; SP110 (Va. State Police investigation report) of
     7/26/99, attached as ex. 1 to Pl.'s Supp'l Response to Court's Hypo.).

2.   Initially, Wilkins was not the focus of the investigation.  However, as the
     investigation evolved, several witnesses implicated him in the activities which
     were the subject of the investigation as well as additional illegal activity.  Among
     other allegations, evidence was obtained that indicated Wilkins arranged, or
     allowed to have arranged, parties on his business premises, a funeral home.
     Witnesses described women dancing completely nude and men performing sex

---

[3]To the extent that matters presented to the grand jury have been considered and are
discussed herein, all issues regarding non-disclosure in the interest of protecting necessary grand
jury secrecy have been resolved in earlier rulings.  (Mem. Op., Feb. 9, 2005).

acts on the dancers.  The female dancers were paid to be present and participate. Male attendees at the party paid to enter.  (Austin's Aff. ¶¶ 9, 12, 13).

3. The investigation also revealed that Wilkins, like King and Crutchfield, participated in exchanges of money for sex, drugs for sex, or money for drugs with certain women.  Wilkins purchased drugs from the same source (Vincent Maurice Lewis ("Lewis")) and provided drugs to certain women as did King and Crutchfield. (Austin's Aff. ¶¶ 7, 8, 13, 19).

4. A state Multi-Jurisdictional Grand Jury met on June 17, 1999, July 15, 1999, August 19, 1999, September 16, 1999, September 23, 1999, and October 21, 1999.  On each occasion, the grand jury heard testimony from various witnesses concerning the allegations and indictments were ultimately issued against King, Crutchfield, Brown, Williams, and Wilkins.  (Austin's Aff. ¶¶ 10, 11, 19, 20).

5. Wilkins was arrested on October 22, 1999, on the state charges of solicitation, aiding in prostitution, and four counts of frequenting a bawdy place.  (Austin's Aff. ¶¶ 15, 16).  After his arrest and after he was advised of his rights against self-incrimination, Wilkins provided an incriminating statement to investigating officers.  (Austin's Aff. ¶ 17) In his statement, Wilkins corroborated much of the information provided in prior witness statements and in testimony before the grand jury.  He admitted, for example, that he knew of the parties being held at the funeral home, that Williams arranged such parties and that during at least one party at the funeral home, Wilkins witnessed three women appear totally nude. Wilkins also admitted that he had seen King collect money during the parties, and at least on one occasion, he saw a man performing oral sex on a woman. (Austin's Aff. ¶¶ 18, 19).

6. Wilkins also admitted that he purchased drugs from Lewis (a/k/a Vincent Maurice Simons) and DeWayne, Lewis' brother.  Wilkins related that he was with Brown and Crutchfield when they picked up a female and exchanged drugs for sex and that he was with Brown and Crutchfield, and Linda Chavis ("Chavis") and Crutchfield, during times when Brown and Chavis were smoking crack cocaine. Wilkins also admitted that he saw Yvonne Green ("Green") perform oral sex for money. (Austin Aff. ¶ 19).

7. Apart from Wilkins' admissions, Austin also discovered that on at least two different occasions, Brown and Crutchfield brought women to the funeral home to smoke crack cocaine and to engage in sex acts.  The investigation revealed that Wilkins was with Crutchfield and Brown when Crutchfield gave Chavis money and/or drugs for sex and that Wilkins gave crack to Green.  Other information indicated Wilkins and Green smoked crack at the funeral home and that another woman, identified as Donna Orange ("Orange"), had sex with Wilkins for money.

(Austin Aff. ¶ 20).

8.    With the agreement of the Commonwealth's Attorney, Defendant Nancy M.
      Thorne, federal authorities assumed responsibility for prosecution of all of the
      defendants involved in the investigation, including Wilkins.  (Austin Aff. ¶ 22).
      Austin testified on multiple occasions before a federal grand jury concerning his
      investigation.  (Austin Aff. ¶ 23).  He was the only witness to appear before the
      grand jury on the matter at any of its multiple sessions.  Subsequently, an
      indictment was issued on March 27, 2000.   (Austin Aff. ¶ 24).  The indictment
      charged that Wilkins facilitated drugs for sex transactions between King,
      Crutchfield, and two female crack addicts, Rosa Tisdale ("Tisdale") and April
      Gauldin ("Gauldin").  (Def.'s Mot. to Dismiss, Ex. A-17, ¶ 10).  Plaintiff was
      accordingly indicted for conspiracy to distribute and distribution of crack cocaine
      (Counts 1, 18).

9.    In his testimony before the federal grand jury on March 27, 2000, Austin was
      asked what drew his attention to King, Crutchfield, and Wilkins.  (G/J Tr. at 2,
      Mar. 27, 2000).[4]  He described how Crutchfield and King had traded drugs for sex
      with Tisdale and Gauldin.  (Id. at 16-19).  When asked how Wilkins was
      involved, Austin testified that Wilkins operated a funeral home with a basement
      that was used for recreational purposes involving the hiring of strippers who
      danced naked and committed sex acts on men who paid an admission charge at
      the door.  (Id. at 16-19).  Austin stated that one of the girls told him that they
      would go to the funeral home to trade crack cocaine for sex and that Wilkins
      allowed such activity to occur.  (Id. at 16-19).  Austin also stated that Wilkins was
      with Crutchfield and Brown at Brown's house and in the car when crack cocaine
      or money was traded for sex, that he knew that Brown had bought cocaine for
      Wilkins, and that he knew through other interviews that Wilkins was a heavy
      crack user at one time.  (Id. at 16-19).

10.   A superseding indictment was issued on May 24, 2000, re-charging Crutchfield,
      Brown, and Wilkins with conspiracy to distribute cocaine. (Def.'s Mot. to
      Dismiss, Ex. A-18, Count 1, Intro. ¶ 5).  The superceding indictment alleged that
      Wilkins purchased crack cocaine from Lewis and distributed crack cocaine to
      women addicted to crack (Manner and Means ¶ 9), as well as King and
      Crutchfield, and that Wilkins pursued Jane Doe #1 through #5 for sex by giving

---

[4]All of the grand jury materials and related evidence such as Austin's investigative notes
are in the record, under seal, and sufficiently identified by caption or other indication rather than
any exhibit designation.  Counsel has had full access to the materials pursuant to the limited
disclosure ordered by the court (Order, Feb. 9, 2005), but the court concludes it is necessary to
preclude further disclosure, absent future court order, because such materials consist of evidence
presented to a grand jury.

the women crack cocaine and money.  (Manner and Means ¶ 11).  While the Jane Does are not named in the Indictment, Wilkins concedes that there is sufficient basis for a claim of distribution against him based upon Green's testimony alone. (Pl.'s Supp'l Mem. Response to Hypo. at 5 n.3).

11.    Austin's testimony before the federal grand jury on May 24, 2000, which was offered in support of the first superceding indictment, did not specifically mention Tisdale and Gauldin as women to whom Wilkins traded drugs for sex.  Austin testified only that Wilkins "carried crack cocaine with him to try to trade for sex with a woman in Mecklenburg County."  (G/J Tr. at 27-31, May 24, 2000).  Consistent with his earlier testimony, Austin stated that Wilkins started buying drugs from Lewis in 1991 or 1992, that he was with Brown and Crutchfield when they traded cocaine for sex in a car, and that he had given crack cocaine to Jane Doe 4 or 5, but he could not remember which one.  (Id. at 27-31).  Austin also stated that Jane Doe 4 was Green, that she had been around Wilkins numerous times when they smoked crack cocaine in front of Crutchfield, and that Wilkins had given crack cocaine to Green.  (Id. at  27-31).

12.    A second and final superseding indictment was issued on September 6, 2000, again charging Wilkins with conspiracy for allowing Crutchfield and King to use his funeral business premises for the trading of sex for crack cocaine with Jane Doe #3. (Def.'s Mot. to Dismiss, Ex. A-19, Count 1, Overt Acts ¶¶ 14, 15(X).  Plaintiff was also indicted for providing crack cocaine to Jane Doe #4 at the funeral parlor.  (Overt Acts ¶15(U), Count 9).  While Wilkins apparently misunderstood the latter conspiracy count to involve Millner during his criminal trial, a review of the grand jury transcript indicates that Jane Doe #3 was actually Carla Brodnax Carter (Carter).  (G/J Tr. at 27, Sept. 6, 2000).

13.    Ultimately, the case against the several criminal defendants was tried to a jury in district court for this division.  The jury returned a verdict of not guilty as concerned Wilkins on the distribution charge (Count Nine) following the dismissal of the only other charge (Conspiracy, Count One) by the court at the conclusion of the government's case-in-chief.  Co-defendants King and Crutchfield were convicted of some of the charges against them and each were ultimately sentenced to periods of incarceration.

Austin argues, in essence, that Wilkins cannot maintain a § 1983 or malicious prosecution action against him because he, Austin, acted on the basis of probable cause as confirmed by the return of true bills of indictment by the grand jury.  In the alternative, Austin asserts that Wilkins cannot maintain his claim on the basis that the evidence upon which the grand jury based its

decision to indict was "merely" insufficient, and because he cannot do so, he cannot sustain his burden of proving that a constitutional right of his has been violated so as to at least overcome the affirmative defense of qualified immunity.

### Analysis

The court finds the following to be the central issues to be resolved:

A.  Whether a review of the grand jury evidence reveals that false and/or misleading evidence that Wilkins committed the offenses charged was offered by Austin in support of the finding of probable cause by the grand jury;

B.  If the evidence offered in support of the finding of probable cause against Wilkins on the subject charges is deemed to have been insufficient, and not false or misleading, whether that finding can support any of Wilkins' claims;

C.  Regardless of whether the particular evidence presented is deemed to have been false, misleading, or only insufficient, does the conduct involved rise to the level of a constitutional deprivation sufficient to support Wilkins' claims?

D.  Whether Austin is entitled to a defense of qualified immunity in any event based on the particular facts and circumstances of the case.

A.  *Whether the evidence presented to the grand jury in support of the charges was false or misleading*

Wilkins argues that Austin, as the lead investigator, knew that neither Tisdale nor Gauldin had implicated Wilkins in the charges presented to the federal grand jury, but that Austin nonetheless sought and obtained the March 2000 indictment against him by failing to inform the grand jury that there was no evidence linking Wilkins to Tisdale or Gauldin.  (Pl.'s Supp'l Mem.

-8-

Resp. to Hypo. at 2-4).  Wilkins argues that without a factual basis for the charge that he, either in his individual capacity or as part of a conspiracy, distributed crack cocaine to Tisdale or Gauldin, such evidence before the federal grand jury was materially false.

In addition, Wilkins emphasizes that the superceding indictments fail to identify the Jane Does to whom Plaintiff allegedly traded sex for drugs, either directly or indirectly.  He also argues that because witness statements Austin obtained from Millner, Chavis, and Carter were inconsistent, and did not therefore corroborate Austin's information, Austin had a duty to present such inconsistencies to the grand jury for its consideration.  As a consequence, Wilkins argues that Austin's statements concerning any alleged a conspiracy involving Tisdale, Gauldin, or Millner was false or materially misleading.[5]  Finally, Wilkins argues that the second superceding indictment proceeded upon a conspiracy claim involving Millner and not Carter.  Thus, because there was conflicting testimony concerning whether Wilkins had carried crack cocaine with him to trade for sex with Jane Doe #3 (Carter), Austin omitted material information in his grand jury testimony by failing to disclose the identity of the correct participant.  (Pl.'s Supp'l Mem. Resp. to Hypo. at 7-8).

Austin argues in response that aside from incorrectly encompassing "deliberately misleading testimony" and "omission of material facts" within the definition of merely insufficient evidence in his present arguments, Wilkins made no claim in his complaint that

---

[5]Although Wilkins concedes there was a sufficient basis for a charge of distribution based upon Green's testimony, he also alleges that Austin and other defendants paid Green for giving false testimony.  (Pl.'s Supp'l Mem. Response to Hypo. at 5 n.3) (Compl. ¶¶ 19-22, 27).  The allegation apparently relates to the payment of relatively minimal witness expenses that is hardly sufficient to overcome the Plaintiff's own admission of liability, as discussed more fully later herein.

Austin omitted material facts; instead he specifically alleged that Austin intentionally presented false and fraudulent evidence to the grand jury.  (Def.'s Supp'l Mem. Resp. to Hypo. at 4-5). Austin also argues that it is of no consequence that two of the four women deposed on behalf of Wilkins during the discovery phase of this case testified that they did not know him, since Austin said nothing to the contrary before the grand jury.  Furthermore, Austin asserts that his testimony *was* consistent with the information provided by Green throughout the investigation.  Thus, Austin asserts that Wilkins has no facts to support his claim where Austin said nothing false, fraudulent, misleading, or materially lacking regarding Wilkins.  (Def.'s Supp'l Mem. Resp. to Hypo. at 4).

The court finds that Wilkins' interpretation of Austin's grand jury testimony fails to establish where Austin made either a false statement or a statement that was deliberately misleading so as to sustain any potential claim for constitutional deprivation.  *See* n.6, *infra* (citing authority for proposition that § 1983 liability can attach for presenting false or misleading testimony that violates due process guarantees). On the contrary, Austin's federal grand jury testimony is consistent with what was presented to the state grand jury and Wilkins' own detailed admissions.   In fact, Austin's grand jury testimony was simply to the effect that Wilkins rode in Brown's car when sex-for-drugs transactions occurred, that he operated the business establishment where strippers performed sex for drugs, that he distributed drugs to a woman with whom he had relations as well as to his co-conspirators, and that he had the same source of supply for drugs as did his co-conspirators, most of which Wilkins independently confirmed in his  own admissions. (G/J Tr. 16-19 (Mar. 27, 2000); G/J Tr. 27-29 (May 24, 2000); G/J Tr. 5-6, 28-29 (Sept. 6, 2000)).  In fact, Austin offered at least two exculpatory statements to the grand

jury regarding Wilkins when he stated in response to a question by a grand juror that he had no evidence that Wilkins derived any profits from using his business premises to sell drugs (G/J Tr. at 22, Mar. 27, 2000), and in response to questioning by a prosecutor on a separate appearance before the grand jury that he did not have evidence that Wilkins demanded sex in return for drugs on a particular occasion (G/J Tr. at 29, Sept. 6, 2000).[6]  What such evidence establishes is that Wilkins engaged in the same behavior as his alleged co-conspirators, but not that they acted in concert together in a conspiratorial sense.[7]

Even assuming Austin failed to inform the grand jury of everything that his sources had disclosed about Wilkins' involvement in any conspiracy, including any inconsistencies, such failure rises, at most, to the level of insufficient evidence, not false or misleading testimony. Furthermore, Wilkins' speculation that reference to Jane Doe "#4 or #5" could not have been meant to refer to Green, and that Austin had a duty to disclose inconsistencies in different witness statements, fails to establish that Austin made a knowingly false or misleading statement with regard to any involvement of Wilkins with those witnesses.  At most, Austin's alleged failure to disclose such inconsistencies was an omission that constituted insufficient evidence, but not false nor misleading evidence.  The issue then is whether any of Wilkins' claims of constitutional deprivation can be sustained on the basis that Austin provided insufficient, but not false or materially misleading evidence.

---

[6]For this court, what would constitute materially misleading evidence would be, for example, where a testifying investigator fails to disclose that a source had recanted earlier statements of an inculpatory nature involving the target of the investigation.

[7]The distribution charge against Wilkins (Count Nine) was resolved in his favor by the jury for whatever other reason.

B.     *Whether a finding that the evidence was insufficient can support any of Plaintiff's claims*?

Austin relies on case precedent for the proposition that an indictment returned by a grand jury conclusively establishes the existence of probable cause and that no claim of constitutional deprivation can be based on the mere insufficiency of the underlying evidence.  (Def.'s Mem. Resp. to Hypo. at 3-6).  Indeed, the Supreme Court has long declined to adopt a rule that would allow a defendant to challenge an indictment on the ground that it was not supported by adequate or competent evidence.  Costello v. United States, 350 U.S. 359 (1956).  In Costello, the charged defendant challenged the government's use of hearsay evidence in presenting the case to the grand jury.  The Court overruled the challenge, reasoning:

> If indictments were to be held open to challenge on the ground that there was *inadequate* or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury.

Id. at 363 (emphasis added).  Austin's argument finds further support from United States v. Calandra in which the Court held that the validity of an indictment cannot be affected by the character of the evidence considered:  "Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence."  414 U.S. 338, 344-45 (1974).

On the other hand, Wilkins relies on Goodwin v. Metts, 885 F.2d 157 (4th Cir. 1989), *cert. denied*, 494 U.S. 1081 (1990), to support his argument that Fourth Amendment rights may be violated if an indictment is based upon insufficient or incomplete evidence.  (Pl.'s Mem. Resp. to Hypo. at 2-4).  Wilkins also cites Amato v. City of Richmond, 875 F. Supp. 1124, 1145 (E.D. Va. 1995), as well as Goodwin, 885 F.2d at 162, in support of his argument that the return

of an indictment by a federal grand jury is not an absolute shield to § 1983 liability regardless of any abuses occurring in the process. (Pl.'s Mem. Resp. to Hypo. at 4-5).

Wilkins further cites Goodwin for the proposition that "[a] police officer who withholds exculpatory information from the prosecutor can be liable under . . . section 1983." Goodwin, 885 F.2d at 162. However, the reasoning of Goodwin was rejected by the Supreme Court in Albright v. Oliver, 510 U.S. 266 (1994), a case later acknowledged by the Fourth Circuit in Taylor v. Waters, 81 F.3d 429, 437 n.5 (4th Cir. 1996), which upholds the basic rule that there is no constitutional right to be free from prosecution on less than probable cause. Nevertheless, a § 1983 action may still be maintained where a plaintiff has alleged a violation of his right to a fair trial.[8] Wilkins accordingly argues that his right to a fair trial was implicated if Austin failed to provide evidence to the prosecutor or the grand jury that would have disclosed the lack of probable cause for the charges on which he was indicted. (Pl.'s Mem. Resp. to Hypo. at 5).

While Wilkins' arguments concerning the validity of his constitutional claim are extensively explored, he fails to address the key issue of whether an indictment that is valid on its face is subject to challenge if it is only based on insufficient evidence. Rather, Wilkins equates insufficiency of evidence with a material omission without offering convincing argument that there *was* a material omission here. Moreover, even if Austin's alleged omission amounts to a withholding of exculpatory evidence as in Goodwin, the Supreme Court in United States v.

---

[8]The district court (J. Spencer) included a discussion of these cases in the Memorandum Opinion denying the Defendant George Austin's Motion to Dismiss the § 1983 claim against Austin in his personal capacity. (Wilkins v. Clary, no. 3:01cv795, Mem. Op. at 9 (June 10, 2002)). The court based its holding on the finding that Plaintiff had adequately set forth his § 1983 claim in the Complaint by alleging an arrest based on false testimony in potential violation of the Fourth Amendment as well as prosecution for crimes without probable cause or due process of law in violation of Fourth and Fourteenth Amendment rights. Id. at 10-11.

Williams, 504 U.S. 36, 55 (1992), held that an indictment is valid despite the fact that substantial exculpatory evidence was not presented where the sole purpose of a grand jury is to determine the adequacy of probable cause, not to determine guilt or innocence.[9]

Although a court has the discretion to dismiss an indictment for prejudicial irregularity, it is limited in such discretion to consider only those irregularities that have substantially affected the decision to indict or that create a serious doubt that the formal charge was free from substantial influence.  *See* United States v. Brewer, 1 F.3d 1430, 1433 (4th Cir. 1993) and Bank of Nova Scotia v. United States, 487 U.S. 250 (1988).  In fact, in Brewer, the Fourth Circuit found that a police officer's perjury was insufficient to create doubt as to the grand jury's decision to indict.  Brewer, 1 F.3d at 1433.  Likewise, in Bank of Nova Scotia, a prosecutor's alleged manipulation of a grand jury investigation was held not to have ultimately affected the charging decision as required to support dismissal of the indictment.  487 U.S. at 260-61.

The Fifth Circuit has also addressed issues similar to those in this case in Rodriguez v. Richey, 556 F.2d 1185, 1191 (5th Cir. 1977) *en banc*, *cert denied*, 434 U.S. 1047 (1978).  In Rodriguez, the plaintiff filed a civil suit against several FBI agents alleging that they violated her Fourth Amendment rights when they mistakenly identified her while presenting evidence to a grand jury that subsequently indicted her.  Id. at 1187-88.  However, the court found no constitutional violation: "when one alleges an arrest without unreasonable force under a valid warrant issued pursuant to a properly constituted grand jury indictment . . . ."  Id. at 1194.  While

---

[9]Williams, 504 U.S. at 51.  The Court in Williams addressed the dismissal of an indictment based on the failure to present exculpatory evidence to the grand jury.  It is distinguishable from this case only to the extent that, in addition to his challenge to the indictment, Plaintiff challenges his subsequent arrest and prosecution as a continuum of violations of the Fourth and/or Fourteenth Amendments.

violations of Fourth Amendment rights may be actionable against state actors under §1983, "it has long been settled that an indictment by a properly constituted grand jury conclusively determines the existence of probable cause and provides the authority for an arrest warrant to issue." Id. at 1191.

Rodriguez is notable as an interpretation of the extent of the constitutional protection afforded to a governmental witness during grand jury proceedings.  Wilkins argues that reliance upon Rodriguez is misplaced because the plaintiff there was merely misidentified and ultimately found innocent, and "mistaken identity" is only one example of "insufficient" evidence.  (Pl.'s Rebuttal Mem. Resp. to Hypo. at 3).  Here, however, Wilkins only puts forth evidence and facts that tend to show that, at most, Austin withheld potentially exculpatory information from the grand jury.  Putting aside Williams, which dismissed a similar challenge to an indictment despite evidence of the failure to produce exculpatory evidence, Wilkins merely speculates that Austin referred to various "Jane Does" whose evidence was inconsistent, without establishing that the evidence would have been necessarily exculpatory.  Exculpatory evidence is "defined as material evidence that would create a reasonable doubt as to the correctness of a guilty verdict at trial." See United States v. Colkley, 899 F.2d 297, 302 (4ᵗʰ Cir. 1990).

Furthermore, Wilkins fails to note that Austin was a witness and that the decision of what evidence to present to the grand jury was the supervising prosecutor's responsibility, aside from the fact that the determination of probable cause based on such evidence as the prosecutor decided to present was exclusively the province of the grand jury.  While it is correct that reliance on legal advice is not sufficient in and of itself to insulate the public official from liability, it is a relevant circumstance to be considered, especially in the context of the charging

decision of whether there is enough evidence to seek indictment on particular charges.  *See e.g.*, Buonocore v. Harris, 134 F.3d 245, 253 (4th Cir. 1998)("[A]lthough reliance on counsel's advice may indeed be a factor to be considered in deciding whether a defendant has demonstrated an 'extraordinary circumstance,' reliance on legal advice alone does not, in and of itself, constitute an extraordinary circumstance sufficient to prove entitlement to the exception to the general Harlow rule.").  Wilkins has not alleged that Austin had any authority over the decision by the federal or state grand juries, nor could such allegations be made in good faith.  Once the evidence was presented to the grand jury, decisions regarding whether to charge Wilkins and how to manage the prosecution were beyond Austin's control.  Stated another way, a finding that Austin's testimony simply provided an insufficient basis for probable cause as opposed to false or materially misleading testimony, even if he withheld exculpatory evidence, is not sufficient to support his challenge to having been indicted at least in the absence of evidence that he participated in the decision to formally indict Wilkins for offenses for which he knew or should have known probable cause was lacking.[10]

Wilkins also alleges that he was arrested solely for the purpose of exerting pressure on him to provide false testimony against King and Crutchfield, the two local law enforcement officers who were the main targets of the investigation (Compl. ¶ 14), and that subsequent to his arrest, pressure was increased to force him to falsely testify against the law enforcement officers

---

[10]Wilkins' claims that he was arrested based upon false and fraudulent evidence presented to the multi-jurisdictional grand jury (Compl. ¶ 12), that Defendants knew or should have known that the evidence presented to the grand juries was false and fraudulent (Compl. ¶ 13), or that he was indicted on multiple occasions based on false or fraudulent evidence (Compl. ¶¶ 23-25), are not supported by the undisputed facts and remaining record (including the evidence presented to the grand jury ) and therefore a finding of constitutional deprivation cannot be sustained.

(Compl. ¶ 16).  While these additional or alternate claims demonstrate that Wilkins' challenges encompass more than just the return of the charges alone, they are also based ultimately on the same allegations of false and fraudulent evidence having been presented to the grand jury.  Thus, just as the indictment cannot be challenged based merely on the insufficiency of evidence, an arrest and subsequent trial resulting from a facially valid indictment cannot be challenged on the basis that there was insufficient evidence to provide probable cause for the charging decision.  Alternatively, Wilkins has not alleged any new facts or evidence that would show that the arrest or trial was based on false or fraudulent evidence independent of the formal charge having been brought.  Wilkins' course of action in response to what he thought to be invalid charges was to proceed to challenge them at trial, as he did successfully.

C.      *Does the alleged conduct otherwise rise to the level of a constitutional deprivation*?

The basic issue in the context of § 1983 in an arrest situation is whether the charging officer had probable cause to believe the person charged had committed the offense, regardless of the ultimate outcome of any ensuing prosecution.  <u>Street v. Surdyka</u>, 492 F.2d 368, 371 (4th Cir. 1974).  In determining whether an officer has probable cause to charge a suspect, "the test is whether a police officer acting under the circumstances at issue reasonably could have believed he had probable cause to arrest, *i.e.*, to believe that the arrestee was committing or had committed a criminal offense."  <u>Sevigny v. Dicksey</u>, 846 F.2d 953, 956 (4th Cir. 1988).  "Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, . . . not on the officer's state of mind at the time the challenged action is taken."  <u>Maryland v. Macon</u>, 472 U.S. 463, 470-71

(1985) (citation omitted).[11]  Accordingly, the existence of probable cause for arrest necessarily precludes any § 1983 claim for unlawful arrest or malicious prosecution regardless of whether the arresting officer had an improper motive for the arrest.

Austin argues that the facts of this case clearly establish that he had probable cause to conduct the investigation that resulted in Wilkins being charged.  (Def.'s Mot. to Dismiss, Mot. Summ. J. at 12).  Austin conducted an investigation over the course of approximately eighteen months, interviewed more than fifty witnesses, obtained detailed evidence concerning Wilkins' involvement in the distribution of cocaine and his association with King and Crutchfield, and ultimately obtained statements from Wilkins in which Wilkins acknowledged and corroborated much, if not all of the activity ascribed to him by many of the sources of information.

Austin also relies on case precedent to assert absolute immunity from § 1983 damages liability for a police officer who testifies in a criminal proceeding.  Briscoe v. Lahue, 460 U.S. 325, 336 (1983).  Once Wilkins was indicted by the grand jury, the prosecution was not under Austin's control.  Only the Commonwealth's Attorney, or subsequently the United States Attorney who took over the prosecution, the latter of whom at least has absolute immunity from suit (Imbler v. Pachtman, 424 U.S. 409 (1976)), had authority over the case.  Any potential recovery against Austin for the charging decision would be dependent upon Wilkins establishing that Austin was materially involved in the decision- making process of the prosecution. McCarthy v. Mayo, 827 F.2d 1310, 1316 (9th Cir. 1987).

In addition to the claims already discussed, Wilkins asserts that an informant was paid

---

[11]Although a public official's subjective intent may be relevant in determining whether there is an intent-based constitutional violation such as in First Amendment scenarios, such an analysis is inapposite here.  See, Mihos v. Swift, 358 F.3d 91, 103-107 (1st Cir. 2004).

$780 to provide false and fraudulent testimony concerning him to the multi-jurisdictional grand jury and the federal grand jury in violation of 18 U.S.C. § 201 (Compl. ¶¶ 19-22), and that, as a result, the second superceding indictment was issued by the federal grand jury on the basis of such false and fraudulent testimony. (Compl. ¶ 27).  In support of these claims, Wilkins offers evidence that one witness, Green, was paid during the course of her cooperation.  (Pl.'s Opp'n to Mot. to Dismiss or Mot. Summ. J., Ex. B).  Wilkins also contends that he learned during the course of the federal criminal trial that Austin had also paid Millner certain sums and that her evidence provided part of the basis for the second superceding indictment.  As such, Wilkins argues that Austin accordingly failed to provide the "total record" to the grand juries concerning what he asserts to be a basis for questioning credibility, namely, that the witnesses were, in effect, bribed.  (Pl.'s Opp'n to Mot. to Dismiss or Mot. Summ. J. at 6).

Austin responds that the evidence of payments demonstrates only the reimbursement of expenses to witnesses who provided cooperation, including testimony before the state multi-jurisdictional grand jury and federal grand juries.  (Pl.'s Reply Supp'l Mot. to Dismiss or Mot. Summ. J. at 4).  Indeed, Wilkins' evidence indicates nothing more than that a witness was reimbursed for food and lodging during the course of the investigation which is standard procedure and hardly the "stuff" of bribery, especially when it is all documented.  In fact, the payments identified in the exhibit offered by Wilkins in support of his allegation are specifically excluded from the scope of 18 U.S.C. § 201, and are otherwise authorized as costs to be borne by the state in accordance with Va. Code Ann. §19.2-215.5.  Wilkins has produced no other evidence in support of his claim that the witnesses were pressured to testify falsely and even though discovery has not yet been conducted on the issue, Plaintiff's theory based on such

activity is insufficient as a matter of law to give rise to any factual dispute that would impact on the situation.[12]

D.    *Whether defendants are entitled to a defense of qualified immunity*

Police officers are entitled to qualified immunity from civil damages in Fourth Amendment cases where it is established that an officer could have reasonably believed an action was lawful, even if it was not.  Anderson v. Creighton, 483 U.S. 635, 638 (1987) (holding no violation "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (a public official performing discretionary function is entitled to qualified immunity in a civil action for damages, provided the conduct involved does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known).  The function of qualified immunity "is to excuse reasonable mistakes in making the composite factual and legal judgments leading to an arrest."  Anderson, 483 U.S. at 640.   The Fourth Circuit has emphasized that claims of qualified immunity are especially appropriate for expedited summary judgment review because immunity is an "entitlement not to stand trial or face other burdens of litigation."  Turner v. Dammon, 848 F.2d 440, 443 (4th Cir. 1988) (quoting Mitchell v. Forsythe, 472 U.S. 511, 530 (1985)).

---

[12]It is well-settled that the government may reimburse witness expenses and even pay fees during investigations and bonuses that are related to convictions.  United States v. Levenite, 277 F.3d 454, 462 (4th Cir. 2002)(holding no violation of § 201 where government paid fees and expenses to a confidential informant of $3300 per month during and investigation and offered a bonus of $100,000 if certain convictions were obtained).  In order to offset the "substantial risk that financial incentives can corrupt," procedural safeguards must be implemented before testimony is received at trial.  Id.  In this case, the witness was reimbursed $782, but she did not testify at trial in any event.

A determination of a police officer's qualified immunity requires a three pronged analysis: (1) an identification of the right violated; (2) whether the right in question was established so clearly as to alert a reasonable officer of its constitutional significance; and (3) whether a reasonable officer would have known that his conduct was unlawful.  Torcasio v. Murray, 57 F.3d 1340, 1343 (4th Cir. 1995).   Each qualified immunity case issue must be analyzed on two levels:

> The first does not involve immunity at all, but focuses on the merits of the plaintiff's claim–whether the defendant's conduct violated a constitutional right of the plaintiff . . . .  Only if the defendant did act illegally must the case proceed to the second level to determine whether he is, nevertheless immune from suit. . . .  When a court addresses qualified immunity in the summary judgment context, it can condense its analysis.  As with any motion for summary judgment, it must view the evidence in the light most favorable to the nonmovant, so it need not make factual findings.  Nor must it determine directly whether the plaintiff's evidence indicates a constitutional violation.  Instead it can combine the second prong of the constitutional inquiry and the first prong of the immunity inquiry by asking whether the plaintiff has 'allege[d] the violation of a clearly established constitutional right.'"

Pittman v. Nelms, 87 F.3d 116, 118-19 & n.2 (4th Cir. 1996).

Plaintiff has not demonstrated the threshold showing of a constitutional violation because of the lack of evidence to support his allegation that the charges that were pursued were based on false and/or materially misleading evidence as opposed to simply insufficient evidence.[13]  In addition, even though a Fourth Amendment right is implicated by the additional allegation that Austin paid witnesses to give false evidence and that he presented such false and fraudulent

---

[13]Given the court's holding that no constitutional deprivation is implicated, it is not necessary to reach the second prong of the analysis in order to determine whether an established constitutional right was "clearly" established.  *See, e.g.*, Parish *ex rel* Lee v. Cleveland, 372 F.3d 294, 309 (4th Cir. 2004); Pittman v. Nelms, 87 F.3d at 118-119, n.2.

information to the grand jury, the undisputed evidence in regard to such allegations is nevertheless insufficient to set forth a violation of a clearly-established constitutional right to be free from unlawful detention and arrest.  Beck v. State of Ohio, 379 U.S. 89, 91 (1964).   The fact that a witness might have been reimbursed for standard expenses is insufficient to state a constitutional violation in the absence of evidence that Austin knew, or reasonably should have known, that the witness was providing false evidence because of the payment, especially where there was substantial corroborative evidence (including Wilkins' own admissions) to justify arrest.

The evidence in this case supports Austin's reasonable belief that he had probable cause to investigate and ultimately to present testimony to the grand jury relating to Wilkins' criminal activities.  The magnitude of the evidence against Wilkins (regardless of the ultimate outcome at trial), including the statements of multiple sources, clearly supported Austin's continued investigation.  The decision of what charges to pursue and whether the evidence presented to the grand jury was sufficient was made by another. Austin is therefore properly afforded the protection of qualified immunity.  Furthermore, even if the court assumes that the nominal amount paid ($782) caused a witness to give false evidence, Austin did not base his investigation solely on such evidence and there is no evidence that he knowingly testified before the grand jury on the basis of such supposedly false evidence such that a reasonable officer under the same circumstances could conclude that he was not acting in derogation of  Wilkins' constitutional rights.

## Conclusion

For the reasons discussed herein, Austin's motion for summary judgment is GRANTED.

An appropriate Order shall issue.

_____/s/_____
_
United States Magistrate Judge

Dated:_____